**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

AMERICAN INTERNATIONAL SPECIALTY
LINES INSURANCE COMPANY, a foreign
corporation,

              Plaintiff,

vs.

MOSAIC FERTILIZER, LLC, a foreign limited
liability company and CSX
TRANSPORTATION, INC., a foreign
corporation,

              Defendants.

_____/

**CASE NO.**

**JUDGE**

## COMPLAINT

NOW COMES American International Specialty Lines Insurance Company ("AISLIC" or "Plaintiff"), on its own behalf and as subrogee and assignee of Kaiser Aluminum & Chemical Corporation, LLC, Environmental Risk Solutions, LLC, K.C. Industries, LLC and K.C. Industries Properties, LLC (collectively "Plaintiff's Assignors"), by and through counsel, and for its Complaint against Mosaic Fertilizer, LLC f/k/a Cargill Fertilizer, LLC ("Mosaic") and CSX Transportation, Inc. ("CSX") (collectively, "Defendants"), hereby alleges and states as follows:

### I.    NATURE OF ACTION

1.    Plaintiff brings this civil action pursuant to Section 107(a) of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9607(a), to recover, jointly and severally, response costs incurred to cleanup contamination; for declaratory judgment for future damages pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. § 2201 and 42 U.S.C. § 9613(g)(2); and for such allocation of liability to Plaintiff if any. Plaintiff also seeks relief based on Florida and common law causes of action.

1

2.      Mosaic arranged for disposal or treatment of its hazardous substances by the Kaiser Aluminum & Chemical Corporation ("Kaiser") at its Mulberry, Florida facility property ("Site") which Site currently contains hazardous substances and waste including arsenic. The Site is a facility from which there was a release, or a threatened release, of hazardous substances, which caused the incurrence of response costs at the Site.

3.      Mosaic or its predecessor owned the Site and operated a mining operation on the Site which lead to the release of hazardous substances.

4.      CSX owned and operated a facility known as the Mulberry Yard, located east of the Site, at which hazardous substances, including but not limited to arsenic herbicides, were disposed of and from which there was a release, or a threatened release, of hazardous substances, including contaminated surface and groundwater, hazardous wastes, and petroleum, which caused the incurrence of response costs at the Site.

5.      As a result of Mosaic's and CSX's actions, hazardous substances, including arsenic, have been and continue to be released into the soil, groundwater and surface water at the Site. Plaintiff and Plaintiff's Assignors have incurred costs in investigating, cleaning up, controlling and monitoring the contamination since 1976.

6.      Plaintiff and Plaintiff's Assignors will be incurring additional response costs in the future as a result of the release of hazardous substances and Defendants' other wrongful conduct.

## II.      JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction over this civil action under 28 U.S.C. § 1331, which provides the District Court with original jurisdiction over all civil actions arising under the laws of the United States and original jurisdiction over all CERCLA cost recovery

actions, respectively.   Moreover, this Court has supplemental jurisdiction over the ancillary and/or pendant state law claims under 28 U.S.C. § 1367.

8.      Venue is proper in this Court because the Site is located in Polk County within the Middle District of Florida, the threatened and actual releases of hazardous substances are occurring in the Middle District of Florida and all the causes of action arose in the Middle District of Florida.   As such, this Court has venue over this civil action under 28 U.S.C. § 1391(a)(2) and 42 U.S.C. § 9607(a).

### III.   PARTIES

9.      Plaintiff AISLIC is a Delaware corporation with business operations in New York City, New York.

10.     Plaintiff is subrogated to and holds assignments of the claims of Environmental Risk Solutions, LLC ("ERS"), Kaiser Aluminum & Chemical Corporation ("Kaiser"), K.C. Industries, LLC ("KCI") and K.C. Industries Properties, LLC ("Properties"), as further described in this action.

11.     Plaintiff is a "person" as defined by Section 101(21) of CERCLA, 42 U.S.C. § 9601(21).   As such, Plaintiff has standing to bring this civil action.

12.     Defendant Mosaic Fertilizer, LLC f/k/a Cargill Fertilizer, LLC is a Delaware limited liability company with business operations in Polk County and other counties in Florida.

13.     Defendant Mosaic is a "person" within the meaning of Section 101(21) of CERCLA, 42 U.S.C. § 9601(21).

14.     Defendant Mosaic produces and markets concentrated phosphate and potash crop nutrients.  The chemicals it distributed to the Site are substances regulated under CERCLA, 42 U.S.C. § 9601 *et seq.*, the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C.

3

§ 6901 *et seq.*, and the Clean Water Act ("CWA"), 33 U.S.C. § 1251 *et seq.* ("Regulated Substances"). These Regulated Substances were released at the Site.

15.     Defendant Mosaic is a person who by contract, agreement or otherwise arranged for disposal or treatment, or arranged with a transporter for disposal or treatment of hazardous substances at a facility owned or operated by another party or entity containing such hazardous substances under Section 107(a)(3) of CERCLA, 42 U.S.C. § 9607(a)(3).

16.     Defendant Mosaic arranged for the treatment, storage, disposal or discharge of Regulated Substances at the Site.

17.     Defendant Mosaic selected the Site for the treatment, storage, disposal or discharge of Regulated Substances.

18.     Defendant Mosaic or its predecessors owned and operated the Site while carrying out mining operations. During the mining operations hazardous substances were released on the Site.

19.     Defendant CSX Transportation, Inc. is a Virginia corporation with business operations in Mulberry, Polk County, Florida.

20.     Defendant CSX is a "person" within the meaning of Section 101(21) of CERCLA, 42 U.S.C. § 9601(21).

21.     Defendant CSX is an owner and/or operator of a switching yard, refueling, servicing, and rail transportation facility in Mulberry, Polk County, Florida under Section 101(20) of CERCLA, 42 U.S.C. § 9601(20). CSX owns the parcel on 450 Seaboard Road, Mulberry, Florida 33860 with the following description "THAT PART OF FOLLOWING DESC LYING N OF SR60 A STRIP OF LAN IN WIDTH OF 60 FT TO 310 FT AS PER MAP V2 FLA -L-22-6A STA0+ 00 TO STA 66+06 BEING PCLS 1,4 & 5 & A STRIP OF LAND 60 FT

WIDE (PCL 2) STA 0+00 TO STA 9+02 CENTRALLY ASSESSED."

22.     Defendant CSX polluted its property with various chemicals during railcar cleaning, fueling, transportation of cargo and use of herbicides. The chemicals it spilled and which then migrated to the Site are Regulated Substances.

23.     Defendants controlled or possessed the ability to control their respective operations at or effecting the Site and individually, or in conjunction with others, caused, participated, controlled or ordered the conduct that caused the pollution alleged in this Complaint and the conditions that are described in this Complaint.

24.     Defendants knew or should have known about such conditions and by themselves, or in conjunction with others, had the authority to prevent and stop such conditions from causing the damages sustained by Plaintiff and Plaintiff's Assignors.

25.     As such, Defendants are liable to Plaintiff for any release or threat of release of Regulated Substances which caused or may in the future cause Plaintiff to incur response costs pursuant to Section 107(a) of CERCLA, 42 U.S.C. § 9607(a) and state and common law. Moreover, Defendants are liable for the other damages caused by the wrongful conduct alleged herein.

## IV.     FACTUAL BACKGROUND

26.     Prior to Kaiser's ownership, the Site was owned by phosphate companies to which Mosaic is a successor and used for phosphate mining.

27.     The Site consists of seven (7) parcels. Within these seven (7) parcels, there are three (3) larger parcels: 031010, 032010 and 032020.

28.     The property associated with parcel #031010, was owned by The Phosphate Mining Co. in 1905 and later sold to Virginia-Carolina Chemical Corp. in 1946. In 1970, Mobil

Chemical Corp. (f/k/a Virginia-Carolina Chemical Corp.) sold this property to Kaiser Aluminum & Chemical Corp.

29.     The property associated with parcel #032010, was owned by The Phosphate Mining Co. in 1905 and later sold to Virginia-Carolina Chemical Corp. in 1946. The property was later sold to Kaiser Aluminum & Chemical Corp. in 1956.

30.     The property associated with parcel #032020, was owned by The Phosphate Mining Co. in 1905 and later sold to Virginia-Carolina Chemical Corp. in 1946.  Through a series of other transfers, this property was later sold to Kaiser Aluminum & Chemical Corp. in 1983.

31.     Through a series of mergers and acquisitions, The Phosphate Mining Co., Virginia-Carolina Chemical Corp. and Mobil Chemical Corp. became Cargill Fertilizer, and Cargill later became The Mosaic Company.

32.     The Mosaic Company agreed to defend, indemnify and hold harmless Cargill and its Affiliates from and against any and all claims, losses, damages, liabilities, actions, suits, proceedings, judgments, orders, fines, penalties or injuries (including costs of defense and investigation) (collectively "Damages") incurred by Cargill as stated in the Master Transition Services Agreement filed by The Mosaic Company with the Securities and Exchange Commission on October 28, 2004, under Section 9C, titled "Warranties; Indemnification," as EX-10.2 to Form 8-K.

33.     Phosphate Mining and Virginia-Carolina conducted phosphate mining operations which included removing surface soil and digging out phosphate rock. The operations left behind disturbed land including deep holes which later became the North and South Pond. The operations also lead to the release of hazardous substances.

34.     Beginning on or around 1957, Kaiser purchased the land where the abandoned mine was located and built a chemical industrial plant. The Site is located at 2420 Old Highway 60, Mulberry, Polk County, Florida 33860.

35.     Kaiser's production facility at the Site produced sodium silicofluoride ($Na_2SiF_6$) by reacting potassium chloride (KCl) or sodium chloride (NaCl) with the waste fluosilicic acid ($H_2SiF_6$) transferred by or purchased from Defendant Mosaic.

36.     Kaiser operated the Facility until 1999 at which point K.C. Industries, LLC, a Florida limited liability company, was formed and took over operations of the facility.

37.     On February 12, 2002, Kaiser filed for bankruptcy. During Kaiser's bankruptcy, Kaiser, KCI, Properties, and ERS entered into the Assumption and Assignment Agreement ("Agreement") and Well Sharing Agreement on August 4, 2004.  Pursuant to the Agreement, ERS assumed Kaiser's cleanup responsibilities for the Site, including certain obligations under a RCRA Post Closure and Corrective Action Permit No. 35580-006-HF, Properties purchased the Site's real property from Kaiser, and Plaintiff issued a policy of insurance.

38.     The Agreement was approved by the Kaiser bankruptcy court on September 24, 2004, and it settled and resolved all responsibility for past and future response costs as to Plaintiff and Plaintiff's Assignors, and as such is a private party settlement agreement that bars contribution claims against them by other parties.

39.     As part of the Agreement, the parties provided that "Kaiser agrees to pay to ERS Five Million and no/100 Dollars ($5,000,000) on or before the Effective Date, which ERS shall allocate and use, in part, to purchase the Environmental Insurance Policy." Agreement, Section 10(j). ERS complied with its contract obligations and put substantially all of the funds in a finite risk experience account maintained by AISLIC for the benefit of Kaiser, KCI and ERS to pay for

remediation, with ERS retaining the right to commute any unpaid balance of the account if remediation is complete.

### Arrangement by Mosaic for the Disposal of Hazardous Substances

40.    Beginning in 1956, waste fluosilicic acid ("acid") was received at the Site from Mosaic's phosphate processing plants by truck.

41.    Mosaic entered into its waste acid transactions with Kaiser for the sole purpose of arranging for disposal or treatment of discarded, used, and no longer useful hazardous substances to Mosaic.

42.    Mosaic was not in the business of manufacturing and selling new and useful acid or arsenic.

43.    Kaiser stored the waste acid in six (6) wooden tanks with a capacity of approximately 100,000 gallons each until the mid 1960's, when a tank failed, contaminating a large area of the Site.  Kaiser subsequently replaced the wooden tanks with six (6) steel tanks of the same capacity.

44.    Kaiser's treatment of Mosaic's waste acid at the Site produced a low pH wastewater which, at sometime prior to 1973, was neutralized with lime.  The wastewater was then discharged by Kaiser to areas known as the "Inactive Drainfield," which subsequently flowed into the "North Pond."

45.    Kaiser also temporarily discharged or spilled low pH wastewater and/or waste acids into the Site's "Surge Basin" and "South Pond."  FDEP subsequently required Kaiser to close these areas as hazardous waste surface impoundments.

46.    In 1973, Kaiser stopped disposal on the surface of the Site and began disposing all of its low pH wastewater in an underground injection well at depths of 5,000 feet below the

surface.

47.    The waste that Mosaic transferred to Kaiser was made during phosphate rock processing where naturally occurring chemicals, such as fluorine and arsenic, are removed from the phosphate rock and become part of Mosaic's liquid waste, which the industry calls "process water."

48.    The process water from phosphate processing is made up of a mixture of phosphoric, sulfuric, and fluosilicic acids and any naturally occurring chemicals found and removed from phosphate rock.  FDEP has concluded that fluosilicic acid is reported to contain traces of arsenic, cadmium, mercury, lead, sulfates, iron, phosphorus and radionuclides.

49.    This mixture of acid, process water, and chemicals, such as arsenic, was a used and no longer useful hazardous substance to Mosaic.

50.    Mosaic installed a collection system to divert the waste acid from its waste water ponds for an alternative disposal method.  Instead of treating the process water itself or using its own waste water ponds for disposal, Mosaic arranged to give away or sell a concentrated form of the waste acid.  In the past, Mosaic also may have allowed Kaiser to install equipment that could collect the acid from Mosaic's plants.

51.    Mosaic took intentional steps to dispose of its waste hazardous substances through its joint venture with Kaiser.  Mosaic planned for the disposal of its used waste hazardous substances with Kaiser, and, therefore, engaged in the deliberate disposal of an unwanted, waste constituent.

52.    In order to render the waste acid more acceptable to end users, Mosaic concentrated the acid.

53.    Upon information and belief, the concentration of the waste acid resulted in the

concentration of all other impurities contained in the waste, including arsenic.

54.     On February 3, 1995, Atlanta Testing & Engineering issued a Waste Analysis Plan, Mulberry, Florida Facility for Kaiser Aluminum & Chemical Corp (the "Study"). The study found the arsenic content of the fluosilicic acid to be 55 mg/l, 56 mg/l, 59 mg/l, and 60 mg/l.

55.     The Study also analyzed samples of Kaiser's process waste and process waste mixed with South Pond water. The results showed the arsenic content in Kaiser's process waste to be 7.3 mg/l, 8.2 mg/l, 5.4 mg/l, 5.2 mg/l and 7.5 mg/l, and that the process waste was acidic.

56.     Upon information and belief, the process waste stream generated by Kaiser and analyzed in the 1995 Study was of the same type and quality as prior process waste streams resulting from the treatment by Kaiser of Mosaic's waste acid.

57.     Kaiser took Mosaic's waste to use the acid component in its own production but had no use for the arsenic that contaminated the acid. The arsenic became part of Kaiser's process waste and was treated, stored and/or disposed of with the waste acid in the Surge Basin, Inactive Drainfield, North Pond, and South Pond until 1973.

58.     Mosaic had reason to know that the acid and arsenic in Kaiser's process waste were pass-through components of Kaiser's treatment of Mosaic's acid, and these pass-through components were released on Kaiser's Site.

59.     Mosaic had reason to know that Kaiser disposed of the acid and arsenic in a way that led to contamination because Mosaic managed acidic process water on its own properties.

60.     Beginning in the mid 1970's, the Florida Department of Environmental Protection ("FDEP") or its predecessors have required Kaiser and others to discharge the process waste derived from Mosaic's waste acid into a 5,000 foot injection well, reduce the water levels of the

North and South Ponds, recover contaminated ground water, and to take other steps to investigate and respond to the acid and arsenic contamination at the Site.

61.     Wherever the wastewater from Kaiser's production was dumped on the Site, studies have shown arsenic at levels that match those levels found in the Study. Groundwater samples in the surficial aquifer under the facility plant area and the adjacent Inactive Drainfield have shown arsenic levels of 66µg/L (monitoring well KS-14), 47 µg/L (KS-5U), 160 µg/L (KS-5L), and 30 µg/L (KS-4U). Water quality results obtained by FDEP's Watershed and Resource Management on October 28, 2004 for the North and South Ponds showed arsenic levels at 47 µg/L in the North Pond and 37 µg/L in the South Pond.

62.     The June 2008 Semiannual Corrective Action Report issued to FDEP for the Site concluded that the applicable groundwater protection standard for arsenic was exceeded in five (5) of the thirteen (13) wells sampled for arsenic. In addition, two (2) areas of the Kaiser Site, a concrete neutralization pit and the South Pond, due to the presence of low pH waste materials, were designated as regulated hazardous waste areas. FDEP has found a ground water plume containing high levels of arsenic in the surficial aquifer adjacent to the Site's facility plant area, Inactive Drainfield and the South Pond.

63.     FDEP has concluded that the KC Industries property is polluted by arsenic. The highest levels of arsenic detected in the surficial aquifer were on the KC Industries property. The North Pond was reported to contain arsenic at a concentration of 47 µg/L ( up to 211 mg/Kg in sediments), the South Pond (260 µg/L) and the KC Industries' waste stream (11,000 µg/L). A halo comprised of above background arsenic levels is present along the railroad corridor and the North Pond outflow.

### Pollution from CSX's Operations

64.     East of the Site, CSX owns the Mulberry Yard at 450 Seaboard Rd., Mulberry, Polk County, Florida 33860 ("Rail Yard").  The Rail Yard has a switching yard and north-south running tracks along the Site's eastern property line.  The Rail Yard is approximately 10 acres wide and covered by rail tracks, paved and unpaved roads and vegetation.  In addition to rail road traffic, this yard served for locomotive fueling, petroleum storage, and rail car cleaning purposes.  According to FDEP, hundreds of train cars daily travel on the tracts carrying mined products from nearby phosphate facilities or delivering bulk supplies.

65.     CSX's Rail Yard has interconnected drainage and containment ditches along portions of its property, specifically northwestern portions, which direct surface water from the Rail Yard into the Fuller Heights community.  As locomotives were refueled or serviced, CSX employees allowed petroleum to spill on the ground and flow to the drainage ditches.  There was enough petroleum flowing in the ditches to the Fuller Heights community that it was clearly visible and part of the community caught on fire.  Seaboard System Railroad, Inc. ("Seaboard"), a predecessor of CSX, received a citation from the Mulberry Fire Department in 1984 for one such incident.  During the time that the Florida Department of Environmental Regulation ("FDER"), FDEP's predecessor, negotiated a consent decree with Seaboard, an additional 800 to 1000 gallons of diesel fuel were spilled on the ground at the Rail Yard.

66.     FDER sued Seaboard for violations involving the petroleum pollution and received $70,000 as final settlement for the violations.  Groundwater testing by Environmental Science & Engineering, Inc. showed the presence of benzene, toluene, ethylbenzene, lead, napthalenes, and polynuclear aromatic hydrocarbons ("PAHs") above detection limits in several monitoring wells.  Concentrations of naphthalene, PAHs and lead exceeded drinking water

standards. The petroleum pollution is evidence of the natural pathway for pollution to travel from CSX to Fuller Heights.

67. Through decades of operations by CSX, additional pollution came from the washing of rail cars. After the rail cars were unloaded, CSX employees washed out the empty cars, letting the water and chemicals transported in the rail cars seep into the ground. Pollution also came from arsenic-based herbicides that CSX sprayed along the tracks to keep foliage down.

68. These chemicals migrated to the Site where they polluted the soil, groundwater and surface water on the Site.

### Pollution from CSX's Storm Water Outfall

69. Half of the portion of CSX's Rail Yard that runs parallel to the Site's eastern boundary has no drainage ditches.

70. Old Highway 60 separates the Rail Yard and the Site.

71. The Site has ditches along its entire eastern boundary ("Kaiser Ditches"). The South Pond and the North Pond are located at the property boundary next to Kaiser's Ditches and represent areas of lowest elevation in the area.

72. During storm events, storm water falling on the Rail Yard where there are no ditches naturally tends to flow towards areas that sit at lower elevations. In this case, the storm water flows across Old Highway 60 into Kaiser's Ditches.

73. During severe storm events, storm water runs across Old Highway 60 into Kaiser's Ditches and also overflows into the South Pond and North Pond because of the low elevation and proximity of the ponds to the ditches and the high volume of water flowing that overburdens the ditches.

74.     Runoff accumulating in these ditches and overflowing the ponds on the Site, increased the amount of water and pollutants that were stored in these ponds.  The onsite ponds on the KCI Site have periodically overflowed during period of high rainfall, releasing runoff to the west into tributaries of the Alafia River.

75.     Since 1976, the runoff and pollutants released by the industrial activities on the Rail Yard and accumulating in the South Pond and North Pond have been pumped into a deep injection well as part of an onsite waste management program.   These water management activities have occurred at significant cost to Site operators, and will continue to occur in the future in part to manage the continued release of runoff and pollutants from the CSX Rail Yard.

### FDEP Requirements, Corrective Actions, Orders, and Legal Actions

76.     Beginning in the mid-1970's, FDEP or its predecessors required Kaiser to pump down the North and South Ponds due to concerns about surface water and groundwater discharges of hazardous substances and low pH wastes.

77.     Beginning in the mid-1980's, FDEP or its predecessors required Kaiser to install groundwater monitoring wells, recover contaminated groundwater, and take other measures to close and monitor regulated hazardous waste areas due to concerns about the presence of hazardous substances and low pH wastes.

78.     Beginning in the mid-1990's, FDEP required that Kaiser undertake site-wide corrective action under RCRA.

79.     On January 18, 2005, FDEP issued a warning letter to Kaiser regarding release of contaminated water from the North Pond and South Pond on the Site that occurred starting on September 9, 2004 due to excessive rainfall in the area.

80.     On August 8, 2005, ERS entered into a Consent Order with FDEP to reach

settlement on matters regarding the Site and make improvements associated with the operation of the North Pond (the "Consent Order"), a major groundwater and storm water control for the area.

81.     On December 20, 2005, FDEP presented Kaiser with a Consent Order.  Kaiser entered into the Consent Order with FDEP without admitting that violations had occurred, without admitting liability, and with no administrative findings of liability.

82.     Pursuant to the Site's RCRA Post Closure and Corrective Action permit, ERS installed drainage improvements and reverse osmosis units in order to manage the elevations of water in the North Pond and to reduce any potential groundwater contamination impacts.  ERS also built a slurry wall around the North Pond to ensure no spillage would occur from or into the pond.

83.     On November 9, 2007, Plaintiffs filed a complaint in the Circuit Court of the 10th Judicial Circuit in and for Polk County, Florida in a matter titled *Bessie Kennon Bender, et al, vs. K.C. Industries, LLC, et al.*, Case No. 53-2007, CA 006859-0000-00, Sec. 08 against Plaintiff's Assignors Kaiser, ERS, KCI, and Industries, and other defendants, alleging, among other things, that Plaintiff's Assignors caused contamination in the Fuller Heights neighborhood adjacent to the Site as a result of the overflow of the North Pond and groundwater contamination.

84.     FDEP's report, Fuller Heights Community Contaminated Ground Water Study Mulberry, Polk County, Florida Contamination Assessment Report, SIS Report Number 2008-04, issued December 2008 concluded that the Site is not a current source of contamination in Fuller Heights.  The report showed that as of 2005, when FDEP commenced its Fuller Heights area investigation and gathered its supporting data, neither ERS, KCI, nor Properties were contributing contamination offsite to Fuller Heights.

85.     Response costs incurred to date by Plaintiff and Plaintiff's Assignors include, but

are not limited to, costs for hazardous waste investigation, disposal, environmental investigation, sampling and assessment activities, costs associated with compliance with FDEP requirements, RCRA permits, Consent Orders, as well as attorneys' fees and other expenses related to the investigation, control, remediation and/or removal of the release or threatened release of hazardous substances.

86.     The response costs incurred by Plaintiff and Plaintiff's Assignors are consistent with the National Contingency Plan ("NCP"), necessary to comply with orders of FDEP and are necessary costs of response.

87.     Defendants are responsible for damages caused by any Regulated Substances that have been released, either separately or in combination, from their respective facilities.

## V.     CAUSES OF ACTION

### COUNT ONE - CERCLA § 107 CLAIM AGAINST MOSAIC

(Liability of Arranger for Disposal of Arsenic and Other Hazardous Substances)

88.     Plaintiff incorporates by reference paragraphs 1 through 87 above, as if fully rewritten herein.

89.     Site is a "facility" as that term is defined by Section 101(9) of CERCLA, 42 U.S.C. § 9601(9).

90.     Mosaic is a "person" who by contract, agreement or otherwise arranged for the disposal or treatment, or arranged with a transporter for disposal or treatment of hazardous substances at the Site as that term is defined under Section 101 (21) of CERCLA, 42 U.S.C. § 9601(21).

91.     During Mosaic's arrangement for the disposal or treatment of "hazardous substances," the "hazardous substances" were released at the Site into the "environment," as

16

those terms are defined in Section 101(14) and 101(8) of CERCLA.

92.     The hazardous substances from Mosaic's operations have been "released," as that term is defined in Section 101(22) of CERCLA, 42 U.S.C. § 9601(22).

93.     The hazardous substances contaminating the Site are among the hazardous substances treated, stored, handled, disposed of or used by the Mosaic.

94.     Arsenic is a hazardous substance under CERCLA, Section 102(a) t and 40 C.F.R. § 302.4, Table 302.4.

95.     Defendant Mosaic gave away or sold waste acid contaminated with arsenic to Kaiser instead of disposing of it at its own property.

96.     The waste acid contaminated with arsenic was or contained a used and no longer useful hazardous substance.

97.     Kaiser disposed of Mosaic's waste arsenic at the Site in the North Pond, South Pond, Inactive Drainfield.  The arsenic then contaminated the North Pond, South Pond, Inactive Drainfield and the soil and groundwater below, among other areas.

98.     The response costs incurred by Plaintiff and Plaintiff's Assignors include, but are not limited to, costs for construction, operation, maintenance, professional environmental engineering, testing, and evaluative work, response costs incurred from Plaintiff's compliance with FDEP requirements, RCRA permits and consent orders, and defense of legal actions, including attorneys' fees, and other expenses related to the assessment, response actions, permanent remediation of the Site and any contaminated surface water, soils and groundwater and other costs of response.

99.     Plaintiff will continue to incur response costs as a result of the contamination at the Site.

100.    The response costs incurred by Plaintiff and Plaintiff's Assignors are consistent with the National Contingency Plan ("NCP") and are reasonable and necessary costs of response.

101.    Plaintiff and Plaintiff's Assignors have taken, are taking, and will continue to take in the future, actions that are consistent with the NCP.

102.    Mosaic is liable to Plaintiff pursuant to Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), for all past and future response costs, including all costs related to controlling of the non-natural levels of arsenic at the Site and the installation and operation of the groundwater recover system, attorneys' fees and expenses, which have been and will be incurred by Plaintiff and Plaintiff's Assignors in response to the release or threatened release of hazardous substances at the Site and in identifying potentially responsible parties.

103.    Moreover, Mosaic is liable to Plaintiff pursuant to Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), for all preliminary investigative costs related to monitoring and evaluating releases of hazardous substances at the Site.

WHEREFORE, Plaintiff demands a judgment under Section 107 of CERCLA, 42 U.S.C. § 9607, requiring Defendant Mosaic to reimburse Plaintiff for all of Plaintiff's and Plaintiff's Assignors' past and future response costs, including the costs of investigation, remediation and/or removal activities to address releases and threatened releases of hazardous substances from the Site; a judgment under Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), requiring Defendant Mosaic to reimburse Plaintiff for all of Plaintiff's and Plaintiff's Assignors' preliminary investigative costs related to monitoring and evaluating releases of hazardous substances from the Site; and an Order awarding all costs of the litigation, including, but not limited to an award of reasonable attorneys' fees and any expert or consulting fees under § 107(a)(4)(B) of CERCLA, 42 U.S.C. § 9607(a)(4)(B);

## COUNT TWO - CERCLA § 107 CLAIM AGAINST MOSAIC
### (Liability of Owner or Operator for Release of Hazardous Substances)

104.    Plaintiff incorporates by reference paragraphs 1 through 103 above, as if fully rewritten herein.

105.    Mosaic or its predecessor companies owned and operated mining operations on the Site.

106.    Mosaic or its predecessor "owned or operated" the Site "at the time of disposal of hazardous substance" under Section 107 of CERCLA, 42 U.S.C. § 9607(a)(2) and as defined in 42 U.S.C. § 9601(20)(A)(ii) and 42 U.S.C. § 9601(29).

107.    Mosaic owned and operated all or portions of the Site at the time of disposal or "release" of "hazardous substances" from the Site into the "environment," as those terms are defined in Sections 101(8), (14) and (22) of CERCLA, 42 U.S.C. § 9601(8), (14) and (22), and 40 C.F.R. Chapter 1, Part 302.

108.    Mosaic or its predecessor mined the Site for phosphates and thereby altered the soil and groundwater. Mosaic mined rock by removing soil and the phosphate rock.  Due to the disturbance of the soil and groundwater, hazardous substances, including arsenic, were released into the environment on the Site thus polluting the Site.

109.    Plaintiff and Plaintiff's Assignors have incurred "response" costs at the Site, as that term is defined in Section 101 (25) of CERCLA, 42 U.S.C. § 9601(25).

110.    The response costs incurred by Plaintiff and Plaintiff's Assignors include, but are not limited to, costs for construction, operation, maintenance, professional environmental engineering, testing, and evaluative work, response costs incurred from Plaintiff's compliance with FDEP requirements, RCRA permits and consent orders, and defense of legal actions, including attorneys' fees, and other expenses related to the assessment, response actions,

permanent remediation of the Site and any contaminated surface water, soils and groundwater and other costs of response.

111.    Plaintiff and Plaintiff's Assignors will continue to incur response costs as a result of the contamination at the Site.

112.    The response costs incurred by Plaintiff and Plaintiff's Assignors are consistent with the National Contingency Plan ("NCP") and are reasonable and necessary costs of response.

113.    Plaintiff and Plaintiff's Assignors have taken, are taking, and will continue to take in the future, actions that are consistent with the NCP.

114.    Mosaic is liable to Plaintiff pursuant to Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), for all past and future response costs, including all costs related to controlling of the non-natural levels of pollutants at the Site and the installation and operation of the groundwater recover system, attorneys' fees and expenses, which have been and will be incurred by Plaintiff and Plaintiff's Assignors in response to the release or threatened release of hazardous substances at the Site and in identifying potentially responsible parties.

115.    Moreover, Mosaic is liable to Plaintiff pursuant to Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), for all preliminary investigative costs related to monitoring and evaluating releases of hazardous substances at the Site.

WHEREFORE, Plaintiff demands a judgment under Section 107 of CERCLA, 42 U.S.C. § 9607, requiring Defendant Mosaic to reimburse Plaintiff for all of Plaintiff's and Plaintiff's Assignors' past and future response costs, including the costs of investigation, remediation and/or removal activities to address releases and threatened releases of hazardous substances from the Site; a judgment under Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), requiring Defendant Mosaic to reimburse Plaintiff for all of Plaintiff's and Plaintiff's Assignors'

preliminary investigative costs related to monitoring and evaluating releases of hazardous substances from the Site; and an Order awarding all costs of the litigation, including, but not limited to an award of reasonable attorneys' fees and any expert or consulting fees under § 107(a)(4)(B) of CERCLA, 42 U.S.C. § 9607(a)(4)(B);

**COUNT THREE - CERCLA § 107 CLAIM AGAINST CSX**
(Liability of Owner or Operator for Release of Hazardous Substances)

116. Plaintiff incorporates by reference paragraphs 1 through 115 above, as if fully rewritten herein.

117. CSX is a "person" within the meaning of Section 101(21) of CERCLA, 42 U.S.C. § 9601(21).

118. CSX "owned or operated" the Rail Yard "at the time of disposal of hazardous substance" at the Rail Yard under Section 107 of CERCLA, 42 U.S.C. § 9607(a)(2) and as defined in 42 U.S.C. § 9601(20)(A)(ii) and 42 U.S.C. § 9601(29).

119. Defendant owned and operated all or portions of the Rail Yard at the time of disposal or "release" of "hazardous substances" from the Rail Yard into the "environment," as those terms are defined in Sections 101(8), (14) and (22) of CERCLA, 42 U.S.C. § 9601(8), (14) and (22), and 40 C.F.R. Chapter 1, Part 302.

120. CSX disposed of hazardous substances benzene, toluene, ethylbenzene, lead, napthalenes, and polynuclear aromatic hydrocarbons ("PAHs") at its Mulberry Rail Yard, which contamination migrated to the Site.

121. In addition, CSX cleaned hazardous substances from its rail cars, and sprayed arsenic-based herbicides along the tracks, which contamination migrated to the Site.

122. The response costs incurred by Plaintiff and Plaintiff's Assignors include, but are not limited to, costs for construction, operation, maintenance, professional environmental

21

engineering, testing, and evaluative work, response costs incurred from Plaintiff's compliance with FDEP requirements, RCRA permits and consent orders, and defense of legal actions, including attorneys' fees, and other expenses related to the assessment, response actions, permanent remediation of the Site and any contaminated surface water, soils and groundwater and other costs of response.

123.    Plaintiff and Plaintiff's Assignors have incurred "response" costs at the Facility, as that term is defined in Section 101 (25) of CERCLA, 42 U.S.C. § 9601(25).

124.    Plaintiff will continue to incur response costs as a result of the contamination at the Site.

125.    The response costs incurred by Plaintiff and Plaintiff's Assignors are consistent with the National Contingency Plan ("NCP") and are reasonable and necessary costs of response.

126.    Plaintiff and Plaintiff's Assignors have taken, are taking, and will continue to take in the future, actions that are consistent with the NCP.

127.    CSX is liable to Plaintiff pursuant to Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), for all past and future response costs, including all costs related to controlling of the non-natural levels of pollutants at the Site and the installation and operation of the groundwater recover system, attorneys' fees and expenses, which have been and will be incurred by Plaintiff and Plaintiff's Assignors in response to the release or threatened release of hazardous substances at the Site and in identifying potentially responsible parties.

128.    Moreover, CSX is liable to Plaintiff pursuant to Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), for all preliminary investigative costs related to monitoring and evaluating releases of hazardous substances at the Site.

WHEREFORE, Plaintiff demands a judgment under Section 107 of CERCLA, 42 U.S.C. § 9607, requiring Defendant CSX to reimburse Plaintiff for all of Plaintiff's and Plaintiff's Assignors' past and future response costs, including the costs of investigation, remediation and/or removal activities to address releases and threatened releases of hazardous substances from the Site; a judgment under Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), requiring Defendant CSX to reimburse Plaintiff for all of Plaintiff's and Plaintiff's Assignors' preliminary investigative costs related to monitoring and evaluating releases of hazardous substances from the Site; and an Order awarding all costs of the litigation, including, but not limited to an award of reasonable attorneys' fees and any expert or consulting fees under § 107(a)(4)(B) of CERCLA, 42 U.S.C. § 9607(a)(4)(B);

## COUNT FOUR - DECLARATORY JUDGMENT

129.    Plaintiff incorporates by reference paragraphs 1 through 128 above, as if fully rewritten herein.

130.    An actual and real controversy exists between Plaintiff and Defendants regarding the rights and obligations, costs of response and other damages arising from the actions of the Defendants, as described in this Complaint.

131.    A declaratory judgment is appropriate under 28 U.S.C. § 2201 and 42 U.S.C. § 9613(g)(2), for a number of reasons, including, without limitation, the following:

        A.    A declaratory judgment will prevent the need for multiple lawsuits, as Plaintiff will incur costs of response and other damages in the future;

        B.    A declaratory judgment will provide a final resolution of the issues between the parties regarding liability for said costs;

C.     A declaratory judgment will assure that Plaintiff will be reimbursed for the costs of response and other damages which have been incurred or will be incurred by Plaintiff and Plaintiff's Assignors, thereby ensuring a proper response to the problem; and

D.     The public interest will be served, as a declaratory judgment will ensure an environmentally proper response.

132.    Declaratory relief is also available and provided for under Section 113(g)(2) of CERCLA, 42 U.S.C. § 9613(g)(2), in an action for recovery of costs under Section 107 of CERCLA, 42 U.S.C. § 9607.

133.    Plaintiff, therefore, requests that the Court enter a declaratory judgment under 28 U.S.C. § 2201, declaring all of the rights, duties, and obligations of the parties with respect to Section 113(g)(2) of CERCLA, 42 U.S.C. § 9613 and Section 107 of CERCLA, 42 U.S.C. § 9607, including but not limited to a declaratory judgment as to Defendants' liability for any future costs of response and damages arising from Defendants' conduct.

WHEREFORE, Plaintiff demands a declaratory judgment under 28 U.S.C. § 2201, declaring all of the rights, duties, and obligations of the parties with respect to Section 113(g)(2) of CERCLA, 42 U.S.C. § 9613, and Section 107 of CERCLA, 42 U.S.C. § 9607, including but not limited to a declaratory judgment as to Defendants' liability for any future costs of response and damages arising from Defendants' conduct at the Site.

## COUNT FIVE – FLA. STAT. § 376.313 CLAIM AGAINST MOSAIC

(Liability under State Law of Polluter For Discharge of Hazardous Substances to Persons)

134.    Plaintiff incorporates by reference paragraphs 1 through 133 above, as if fully rewritten herein.

135.   Section 376.313(3) creates a private right of action for any person to bring a cause of action for all damages resulting from a discharge or other condition of pollution covered by §§ 376.30-376.317.   Section 376.313(3) also provides that a party has a right to contribution from other parties for prohibited discharges of pollutants or hazardous substances or other pollution conditions.

136.   Section 376.301(28) defines person "as any individual, partner, joint venture, or corporation; any group of the foregoing, organized or united for a business purpose; or any governmental entity."   Plaintiff is a person under § 376.313 because as a corporation, it is "organized or united for a business purpose" under § 376.301(28).

137.   Discharge is defined as "spilling, leaking, seeping, pouring, misapplying, emitting, emptying, releasing, or dumping of any pollutant or hazardous substance which occurs and which affects lands and the surface and ground waters of the state." § 376.301(13).

138.   Discharge occurred when Kaiser's waste, which included Mosaic's arsenic, spilled, leaked, seeped, was poured, misapplied, emitted, emptied, released or dumped on the Site in areas including but not limited to the facility, the North Pond, South Pond, and Inactive Drainfield.

139.   Hazardous substances are defined in § 376.301(21) as "those substances defined as hazardous substances in the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA") as amended by the Superfund Amendments and Reauthorization Act of 1986."

140.   Arsenic is a hazardous substance under CERCLA which lists arsenic as a hazardous substance under section 102(a) of the Act and 40 C.F.R. § 302.4, Table 302.4.

141.   As a result of Mosaic's actions, Kaiser's property was polluted with hazardous

substances and Mosaic is liable to Plaintiff for all damages suffered by Plaintiff and Plaintiff's Assignors to cleanup and manage the hazardous substances, and an order requiring Mosaic to remediate and/or abate the pollution or threatened pollution and for such other and further relief as the Court deems just and proper.

WHEREFORE, Plaintiff demands a judgment requiring Mosaic to reimburse Plaintiff for all past costs incurred, and all costs that will be incurred in the future by Plaintiff and Plaintiff's Assignors in response to the releases or threatened releases of hazardous substances, reasonable attorneys' fees, pursuant to § 376.313 and any and all further relief that the Court deems just and proper.

## COUNT SIX – FLA. STAT. § 376.313 CLAIM AGAINST CSX

142.    Plaintiff incorporates by reference paragraphs 1 through 141 above, as if fully rewritten herein.

143.    Section 376.313(3) creates a private right of action for any person to bring a cause of action for all damages resulting from a discharge or other condition of pollution covered by §§ 376.30-376.317. Section 376.313(3) also provides that a party has a right to contribution from other parties for prohibited discharges of pollutants or hazardous substances or other pollution conditions.

144.    Section 376.301(28) defines person "as any individual, partner, joint venture, or corporation; any group of the foregoing, organized or united for a business purpose; or any governmental entity." Plaintiff, a Delaware corporation is a group of individuals "organized or united for a business purpose" under § 376.301(28).

145.    Discharge is defined as "spilling, leaking, seeping, pouring, misapplying, emitting, emptying, releasing, or dumping of any pollutant or hazardous substance which occurs

and which affects lands and the surface and ground waters of the state." § 376.301(13).

146.    Discharge occurred when CSX's hazardous substances, groundwater, waste water, and storm water spilled, leaked, seeped, was poured, misapplied, emitted, emptied, released or dumped on the Site in areas including but not limited to the facility, the North Pond, South Pond, and Inactive Drainfield.

147.    CSX discharged pollutants and/or hazardous substances on the Rail Yard including but not limited to chemicals transported by rail, washed out of railcars, sprayed as herbicides, and used in maintenance and operations of the Rail Yard.

148.    Plaintiff and Plaintiff's Assignors incurred costs to remediate, monitor and cleanup the pollution stemming from CSX's property.  Plaintiff and Plaintiff's Assignors also incurred costs and/or damages in maintaining groundwater, wastewater, storm water, and surface water discharge and control systems authorized and/or permitted by the State of Florida, thereby, entitling Plaintiff to seek damages from CSX.

WHEREFORE, Plaintiff demands a judgment requiring CSX to reimburse Plaintiff for all past costs incurred and all costs that will be incurred in the future by Plaintiff and Plaintiff's Assignors in response to the releases or threatened releases of hazardous substances, reasonable attorneys' fees, pursuant to Fla. Stat. § 376.313 and any and all further relief that the Court deems just and proper.

## COUNT SEVEN - NUISANCE AGAINST CSX

149.    The allegations set forth in paragraphs 1 through 148 are realleged and incorporated herein by reference as if fully set forth herein.

150.    CSX allowed Regulated Substances, such as those transported by rail, that are hazardous substances, hazardous wastes, or solid wastes, and/or pollutants to be released at its

property or from its wastes.

151.   Such releases by CSX could have been prevented by CSX.

152.   The releases by CSX of Regulated Substances contaminated the area-wide groundwater, and constitute a nuisance because they interfere unreasonably with use and enjoyment of the Site.

WHEREFORE, is entitled to injunctive relief requiring CSX to cease and abate the nuisance, including any pollution to the Site that has resulted from the nuisance, and for an award of damages for permanent harm caused by the nuisance.

## COUNT EIGHT - TRESPASS AGAINST CSX

153.   The allegations set forth in paragraphs 1 through 152 are realleged and incorporated herein by reference as if fully set forth herein.

154.   Plaintiff's Assignors enjoy all rights that flow from the ownership, tenancy or licensure of the Site ("Property Rights").

155.   CSX has interfered with Plaintiff's Assignors' Property Rights through its release of Regulated Substances at the Rail Yard, including into the groundwater, both intentionally and through processes under its control.

156.   Regulated substances released by CSX migrated to the Site, and as such constitute both a past and a continuing trespass.

157.   As a direct and proximate result of CSX's wrongful conduct, Plaintiff and Plaintiff's Assignors have incurred damages and are entitled to recover the amount of such damages, restrictions, impairments and costs, in whole or in part, arising from the Regulated Substances on, at, or originating from the Rail Yard.

WHEREFORE, Plaintiff demands a judgment in favor of Plaintiff and against CSX awarding compensatory damages, with interest, costs and any and all further relief that the Court deems just and proper.

**COUNT NINE - NEGLIGENCE AGAINST CSX**

158.     The allegations set forth in paragraphs 1 through 157 are realleged and incorporated by reference as if fully set forth herein.

159.     CSX owed a duty to maintain the rail yard facility surface water, storm water and ground water on its property and was negligent, breaching its duty, in the manner in which it maintained the rail yard facility surface water, storm water and ground water on its property.

160.     As a direct and proximate result of CSX's breach of its duty in maintaining its surface water, storm water and ground water, the Site was damaged.

161.     As a direct and proximate result of CSX's gross negligence, Plaintiff and Plaintiff's Assignors incurred damages and are entitled to recover the amount of such damages, caused by the surface water, storm water and ground water on, at or originating from the Rail Yard.

WHEREFORE, Plaintiff respectfully requests this Court enter judgment in Plaintiff's favor and against CSX for damages, together with an award of costs, and such other and further relief as this Court deems just and proper.

**COUNT TEN – GROSS NEGLIGENCE AGAINST CSX**

162.     The allegations set forth in paragraphs 1 through 161 are realleged and incorporated by reference as if fully set forth herein.

163.     Defendant CSX, had a duty to maintain the rail yard facility surface water, storm water and ground water on its property and was grossly negligent, breaching its duty, in the

manner in which it maintained the rail yard facility surface water, storm water and ground water on its property.

164.   As a direct and proximate result of CSX's breach of its duty in maintaining its surface water, storm water and ground water, the Site was damaged.

165.   As a direct and proximate result of CSX's gross negligence, Plaintiff and Plaintiff's Assignors incurred damages and is entitled to recover the amount of such damages, caused by the surface water, storm water and ground water on, at or originating from the Rail Yard.

WHEREFORE, Plaintiff respectfully requests this Court enter judgment in Plaintiff's favor and against CSX for damages, together with an award of costs, and such other and further relief as this Court deems just and proper.

R. Paul Roecker (Florida Bar No. 120073)
ROETZEL & ANDRESS, LPA
420 South Orange Avenue
CNL Center II – 7th Floor
Orlando, Florida 32801
Phone: (407) 896-2224
Fax: (407) 835-3596

and

Thomas M. Skove (Ohio Supreme Ct. No. 0008484)
ROETZEL & ANDRESS, LPA
1375 East Ninth Street
One Cleveland Center – 9th Floor
Cleveland, Ohio 44114
Phone: (216) 623-0150
Fax: (216) 623-0134
tskove@ralaw.com
sfunk@ralaw.com
*Pro Hac Vice Admission Pending*

*Attorneys for Plaintiff, American International Specialty Lines Insurance Company*

## <u>JURY DEMAND</u>

Pursuant to Rule 38, Federal Rules of Civil Procedure, Plaintiff hereby demands trial by a jury on all claims for relief that may be subject to a jury trial under federal and state law.

R. Paul Roecker
*Attorney for Plaintiff*

428763 v_03 \ 117219.0003